AUTHORIZED AND APPROVED/DATE: s/Drew E. Davis 9-10-2026

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

FILED

12:25 pm, Sep 11, 2026

JOAN KANE, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA
By: AC, Deputy Clerk

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
A Blue Apple iPhone 16 Pro Max in a blue and black case with assigned call number 405-900-3364, currently located at the Bureau of Alcohol, Tobacco, Firearms and Explosives within the Western District of Oklahoma

Case No. MJ-26-451-CMS

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 933 | Firearm Trafficking |
| 18 U.S.C. § 922(a)(1)(A) | Engaging in the Business of Dealing Firearms without a License |
| 18 U.S.C. § 923(a) | |

The application is based on these facts:

See attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Marc Brown, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: September 11, 2026

[signature: Chris M. Stephens]
*Judge's signature*

City and state: Oklahoma City, Oklahoma

CHRIS M. STEPHENS, U.S. MAGISTRATE JUDGE
*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **A BLUE APPLE IPHONE 16 PRO MAX IN A BLUE AND BLACK CASE WITH ASSIGNED CALL NUMBER 405-900-3364** | **Case No. M-26-** 451 **-CMS** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Marc Brown, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), having been duly sworn, depose and state as follows:

## INTRODUCTION AND OFFICER BACKGROUND

1. I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). I have been employed as an ATF SA since January 2024 and am currently assigned to the ATF Oklahoma City Field Office in the Western District of Oklahoma. Prior to my employment with ATF, I was employed by the Lancaster Police Department for approximately four (4) years. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy. As a ATF SA, I investigate violations of Federal law, including violations of the Gun Control Act of 1968, as amended (18 U.S.C. §§ 921, et seq.), and explosives, arson, alcohol, and tobacco laws. As a Federal agent, I am authorized to investigate violations of United States laws and to execute warrants under the authority of the United States.

2. During my employment as an ATF Special Agent, I have received specialized training regarding, and have personally participated in, various types of investigative activity. This includes, but is not limited to, the following: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants and other individuals who have knowledge concerning violations of federal firearms laws; (c) arson investigations; (d) undercover operations; (e) the execution of search warrants; (f) the consensual monitoring and recording of conversations; (g) electronic surveillance through the use of pen registers and trap and trace devices; (h) the court-authorized interception of both wire and electronic communications (i.e., Title III wiretaps); and (i) the handling and maintenance of evidence.

3. I have conducted multiple investigations targeting individuals engaged in trafficking firearms, in violation of 18 U.S.C. § 933, and individuals engaged in dealing firearms without a license, in violation of 18 U.S.C. §§ 922(a)(1)(A) and 923(a). I have experience in the methods used in firearm trafficking investigations, including but not limited to, debriefing cooperating witnesses and cooperating sources, the preparation and execution of search warrants, and making arrests. In light of this experience, I know the following:

a. I am aware of the methods in which firearm traffickers and unlicensed firearm dealers often use electronic devices, including computers, tablets, cell phones, and other electronic storage devices, to communicate and coordinate firearm transactions and execute electronic transactions

which can, in turn, create automatic records and documentation of the unlawful firearm transactions;

b. I am aware that individuals engaged in trafficking firearms and dealing without a license often use electronic devices to track and document financial transactions;

c. I am aware that individuals engaged in trafficking firearms and dealing without a license will frequently keep contact information and other evidence related to the unlawful sales of firearms on cellular phones, computers, tablets, and other storage devices that they often keep on or near their person;

d. I am also aware that individuals engaged in trafficking firearms and dealing without a license will often use cellular phones to further their financial businesses using digital communication, including, but not limited to, e-mail and instant messaging; and

e. I am aware that individuals engaged in trafficking firearms and dealing without a license will often use electronic devices to communicate with the individuals for whom they are transporting firearms, including coordinating addresses for pickups and deliveries, communicating about status of the transportation, especially over long distances, and communicating to confirm successful deliveries.

4. This Affidavit is based upon my personal investigation and upon information received from other law enforcement officers and agents and may not be inclusive of all evidence or information available or of all facts known to me relative to this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrant.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5. I make this Affidavit in support of an application for a search warrant authorizing the examination of one cellular electronic device: **a blue Apple iPhone 16 Pro Max in a blue and black case with assigned call number 405-900-3364**, (the **"SUBJECT DEVICE")** and further described in **Attachment A**, which is located at the ATF Oklahoma City Field Office within the Western District of Oklahoma, for evidence of firearm trafficking, in violation of 18 U.S.C. § 933, and engaging in the business of dealing firearms without a license, in violation of 18 U.S.C. §§ 922(a)(1)(A) and 923(a). The applied-for warrant would authorize the forensic examination of the **SUBJECT DEVICE** for the purpose of identifying and seizing electronically stored data specifically described in **Attachment B**.

## PROBABLE CAUSE

6. On or about July 20, 2026, ATF agents learned that **Pedro R. MERAZ** had purchased several firearms between May 2024 and June 2026 from Federal Firearms Licensees (FFLs) located in the Oklahoma City, Oklahoma, area. ATF Form 4473s were obtained for **MERAZ's** known firearm purchases, which revealed that **MERAZ** purchased approximately thirty-eight (38) firearms since May 2024—many of those firearms were duplicates or similar calibers.

7. On or about July 20, 2026, ATF agents also learned that **MERAZ** had crossed the United States/Mexico international border multiple times at the same port of entry located in Hidalgo, Texas. ATF agents discovered that many of **MERAZ's** border crossings into Mexico appeared to be by vehicles associated with **MERAZ** within days of purchasing multiple firearms in the Oklahoma City area.

a. A black Chevrolet Truck bearing Oklahoma tag "NZN281" is registered to **MERAZ** and his father.

b. A trailer bearing Oklahoma tag "9P3604" has been observed by law enforcement to be attached to the black Chevrolet, and it is registered to **MERAZ's** father.

8. As of the date of this Affidavit, **MERAZ** has the following known firearm purchases and documented travel to-and-from Mexico:

a. <u>Suspicious Sequence 1</u>:

i. On May 16, 2024, **MERAZ** purchased three (3) Glock, model 25, .380 caliber pistols from Bass Pro Outdoor World located at 1200 W Memorial Rd, Oklahoma City, Oklahoma.

ii. On May 20, 2024, the trailer with Oklahoma tag 9P3604 was documented entering Mexico.

iii. On July 3, 2024, **MERAZ** was documented entering the United States driving the black Chevrolet Truck bearing Oklahoma tag NZN281 with the trailer, bearing Oklahoma tag 9P3604, attached.

b. <u>Suspicious Sequence 2</u>:

i. On July 19, 2024, **MERAZ** purchased two (2) more Glock, model 25, .380 caliber pistol, one (1) Beretta, model 80X CHE ETAH, .380 caliber pistol, one (1) Walther, model P22, .22 caliber pistol, and one (1) Marlin, model 605B, .22 LR caliber

rifle from Bass Pro Outdoor World located at 1200 W Memorial Rd, Oklahoma City, Oklahoma.

ii. On July 21, 2024, the trailer with Oklahoma tag 9P3604 was documented entering Mexico.

iii. On July 27, 2024, **MERAZ** was documented entering the United States.

c. Suspicious Sequence 3:

i. On October 21, 2024, **MERAZ** purchased one (1) Glock, model 43x, 9mm caliber pistol and one (1) Walther, model PPK/S-1, .380 caliber pistol from Extra Cash Gold & Loan located at 1309 N Macarthur Boulevard, Oklahoma City, Oklahoma.

ii. On October 25, 2024, **MERAZ** purchased One (1) Glock, model GEN3, .380 caliber pistol and one (1) Beretta, model 92FSR, .22LR caliber pistol from H & H Gun Range located at 400 S Vermont, Oklahoma City, Oklahoma.

iii. On October 27, 2024, the trailer with OK tag 9P3604 was documented entering Mexico.

iv. On November 13, 2024, **MERAZ** was documented entering the United States driving the black Chevrolet Truck bearing Oklahoma tag NZN281 with the trailer, bearing Oklahoma tag 9P3604, attached.

d. Suspicious Sequence 4:

i. On November 16, 2024, **MERAZ** purchased one (1) Marlin, model 6079, .22LR caliber rifle, and one (1) Henry, model Hool, .22LR caliber rifle from Kings Pawn &Gun located at 4225 E Reno Oklahoma City, OK.

ii. On December 5, 2024, **MERAZ** purchased one (1) Marlin, model 60, .22LR caliber rifle, and one (1) Ruger, model Mark IV, .22LR caliber pistol from H & H Gun Range located at 400 S Vermont, Oklahoma City, Oklahoma.

iii. On December 8, 2024, the trailer with Oklahoma tag 9P3604 was documented entering Mexico.

iv. On February 17, 2024, **MERAZ** was documented entering the United States.

e. Suspicious Sequence 5:

   i. On March 3, 2025, **MERAZ** purchased one (1) Stevens, model 87D, .22LR caliber rifle from Kings Pawn & Gun located at 4225 E Reno, Oklahoma City, Oklahoma.

   ii. On March 9, 2025, the trailer with Oklahoma tag 9P3604 was documented entering Mexico.

   iii. On April 5, 2025, **MERAZ** was documented entering the United States.

f. Suspicious Sequence 6:

   i. On April 29, 2025, **MERAZ** purchased one (1) Sig Sauer, model P320, 9mm caliber pistol, and one (1) Walther, model Colt Government, .22LR caliber pistol from Sooner State Pawn located at 4205 NW 23rd St, Oklahoma City, Oklahoma.

   ii. On May 5, 2025, **MERAZ** purchased one (1) Winchester, model 190, .22 caliber rifle firearm from Kings Pawn & Gun located at 4225 E Reno, Oklahoma City, Oklahoma.

   iii. On May 17, 2025, the trailer with Oklahoma tag 9P3604 was documented entering Mexico.

   iv. On July 9, 2025, **MERAZ** was documented entering the United States.

g. Suspicious Sequence 7:

   i. On July 17, 2025, **MERAZ** purchased one (1) Mossberg, model 500, .410 bore gauge shotgun from Extra Cash Gold & Lawn located at 2111 W Hefner Rd, Oklahoma City, Oklahoma.

   ii. On July 22, 2025, the trailer with Oklahoma tag 9P3604 was documented entering Mexico.

   iii. On July 31, 2025, **MERAZ** was documented entering the United States.

h. Suspicious Sequence 8:

   i. On August 5, 2025, **MERAZ** purchased one (1) Beretta, model 84F, .22LR caliber pistol from H & H Gun Range located at 400 S Vermont, Oklahoma City, Oklahoma.

ii. On August 10, 2025, **MERAZ** purchased one (1) Beretta, model M9A1, .22LR caliber pistol from H & H Gun Range located at 400 S Vermont, Oklahoma City, Oklahoma.

iii. On August 31, 2025, **MERAZ** purchased one (1) Glock, model 25, .380 caliber pistol, and one (1) Glock, model 19, 9mm caliber pistol from Rainer Arms located at 3208 Cooke Way, Oklahoma City, Oklahoma.

iv. On September 3, 2025, the trailer with Oklahoma tag 9P3604 was documented entering Mexico.

v. On October 18, 2025, **MERAZ** was documented entering the United States driving the black Chevrolet Truck bearing Oklahoma tag NZN281 with the trailer, bearing Oklahoma tag 9P3604, attached.

i. <u>Suspicious Sequence 9</u>:

i. On December 5, 2025, **MERAZ** purchased one (1) Glock, model 25, .380 caliber pistol from Rainer Arms located at 3208 Cooke Way, Oklahoma City, Oklahoma.

ii. On December 10, 2025, **MERAZ** purchased one (1) Beretta, model 843, .380 caliber pistol and one (1) Marlin, model 60, .22 caliber rifle from Kings Pawn & Gun located at 4225 E Reno, Oklahoma City, Oklahoma.

iii. On December 13, 2025, **MERAZ** purchased one (1) Smith & Wesson, .20-gauge shotgun from Extra Cash Gold & Loan located at 8316 S Western Ave., Oklahoma City, Oklahoma.

iv. On December 17, 2025, the trailer with Oklahoma tag 9P3604 was documented entering Mexico.

v. On February 27, 2026, **MERAZ** was documented entering the United States.

j. <u>Suspicious Sequence 10</u>:

i. On March 8, 2026, **MERAZ** purchased two (2) Glock, model 17, 9mm caliber pistols from the Claud Hall Gun Show located at 3001 General Pershing Boulevard, Oklahoma City, Oklahoma.

ii. On March 11, 2026, the trailer with Oklahoma tag 9P3604 was documented entering Mexico.

iii. On March 25, 2026, **MERAZ** was documented entering the United States driving a vehicle with the trailer, bearing Oklahoma tag 9P3604, attached.

k. Suspicious Sequence 11:

i. On March 30, 2026, **MERAZ** purchased one (1) Glock, model 43X, 9mm caliber pistol, and one (1) Glock, model 19, 9mm caliber pistol from Kings Pawn & Gun located at 4225 E Reno, Oklahoma City, Oklahoma.

ii. On March 31, 2026, **MERAZ** purchased one (1) Sig Sauer, model P322, .22LR caliber pistol from H & H Gun Range located at 400 S Vermont, Oklahoma City, Oklahoma.

iii. On April 3, 2026, the trailer with Oklahoma tag 9P3604 was documented entering Mexico.

iv. On May 26, 2026, **MERAZ** was documented entering the United States driving a vehicle with the trailer, bearing Oklahoma tag 9P3604, attached.

l. Suspicious Sequence 12:

i. On June 22, 2026, **MERAZ** purchased one (1) Beretta, model 80X, .380 caliber pistol, and one (1) Browning, model 1911, .380 caliber pistol from H & H Gun Range located at 400 S Vermont, Oklahoma City, Oklahoma.

ii. On June 28, 2026, the trailer with Oklahoma tag 9P3604 was documented entering Mexico.

iii. On August 10, 2026, **MERAZ** was documented entering the United States in a black Chevrolet truck bearing Oklahoma tag MCM883. This tag is registered to **MERAZ's** father for an orange Chevrolet truck.

9. Based on my training and experience, this repeated pattern of purchasing multiple firearms—often of the same make and model—and traveling to Mexico shortly thereafter is consistent with activity commonly

associated with individuals who purchase firearms in the United States and sell them in Mexico where firearms are more difficult to lawfully obtain.

*Review of June 22, 2026, Purchase of Firearms at H&H Shooting and Sports*

10. ATF agents recovered and reviewed the video surveillance footage from **MERAZ's** most recent known firearms purchase at H&H Shooting and Sports ("H&H") on June 22, 2026. The following timeline of events is based on my review of the surveillance footage:

a. At about 12:13 p.m., **MERAZ** arrived at H&H driving a black Chevrolet Silverado truck, bearing Oklahoma tag NZN281, with a green bedcover. **MERAZ** walked into H&H alone.

b. At approximately 12:16 p.m., **MERAZ** was inside H&H at the handgun section of the store. For approximately seven (7) minutes, **MERAZ** walked around the handgun section looking at different guns.

c. At approximately 12:23 p.m., while looking at different handguns, **MERAZ** pulled out his phone, quickly looked at his messages, and then briefly scrolled through what appeared to be a website before putting his phone away. **MERAZ** then appeared to ask a store employee to retrieve a specific firearm. **MERAZ** viewed the firearm for approximately nine (9) seconds before handing it back to the employee.

d. Starting around 12:24 p.m., **MERAZ** began walking around the handgun section for approximately nine (9) minutes. **MERAZ** stayed in one specific area of the handgun section for approximately seven (7) of the nine (9) minutes. Multiple employees walked past **MERAZ** within those seven (7) minutes, and **MERAZ** never asked to see another handgun.

e. At approximately 12:33 p.m., **MERAZ** was still standing in the same specific area of the handgun section when he pulled out his cellphone. As **MERAZ** pulled out his phone, he held the

phone at an angle as if he was taking a photo. **MERAZ** then appeared to type something on his phone before putting it away. Approximately 5 seconds later, **MERAZ** pulled out his phone and looked at it for approximately twenty-five (25) seconds. Within those twenty-five (25) seconds, **MERAZ** appeared to look at his phone then look at a firearm then look back at his phone multiple times as if he was comparing the firearm to something on his phone. A few seconds later, **MERAZ** leaned towards the firearms and held his phone as if he was taking another photo. **MERAZ** then backed away and appeared to be typing something on his phone.

f. At approximately 12:35 p.m., an employee approached **MERAZ** while he was on his cellphone. **MERAZ** then pointed to a firearm implying he wanted to see it. The employee handed **MERAZ** the firearm, and **MERAZ** looked at it for approximately ten (10) seconds before handing it back to the employee. **MERAZ** then pointed to another firearm for the employee to pull. While the employee was pulling the firearm, **MERAZ** looked at his phone and appeared to begin typing something. **MERAZ** then looked at the next firearm for approximately fifteen (15) seconds before handing it back to the employee. **MERAZ** then told the employee he wanted to purchase two of the firearms he had looked at in the store. When the employee walked away, **MERAZ** pulled out his phone again and began typing for approximately thirty (30) seconds.

g. **MERAZ** subsequently filled out the standard ATF Form 4473 paperwork and checked out with the cashier. A review of the receipt showed that **MERAZ** paid for both firearms and a box of ammunition in cash. The ammunition **MERAZ** purchased was .22 caliber ammunition, however, the firearms **MERAZ** purchased were both .380 caliber pistols. **MERAZ's** total purchase cost was $1,347.44, and **MERAZ** provided the cashier with $1,400 in cash. **MERAZ** appeared to have more cash in his wallet.

11. A review of ATF Form 4473s completed by **MERAZ** showed that he provided his address as being located in Oklahoma City, Oklahoma.

12. On July 17, 2026, ATF requested employment records for **MERAZ** from the State of Oklahoma. ATF was notified that there were no responsive records from 2022 to the present.

13. On September 1, 2026, an ATF agent confirmed that **MERAZ** was not a licensed FFL dealer, nor had he been licensed to deal firearms between May 16, 2024, to the present.

14. Law enforcement was able to identify two cellphone numbers associated with **MERAZ**.

a. First, law enforcement database records reflect that **MERAZ** pays the bills for the cellphone with assigned call number **405-900-3364**.

b. Second, law enforcement database records reflect that an individual believed to be **MERAZ's** extended family member pays the bills for 682-230-6918. Based on law enforcement databases, it appears that 682-230-6918 is tied to one of **MERAZ's** social media accounts.

    i. On August 13, 2026, an undercover ATF agent (UC-1) called 682-230-6918, and a female answered the phone. When UC-1 asked to speak to "Pedro," the female handed the phone to a male who identified himself as "Pedro." Law enforcement believes that this male was **Pedro R. MERAZ**.

15. On or about August 20, 2026, while reviewing toll records related to each phone, ATF agents discovered that both phones were actively being used around the time **MERAZ** purchased the two firearms on June 22, 2026.

16. Toll records reflect that on the date of each known purchase of firearms in 2026, the 682-230-6918 phone number contacted a specific phone

number with an area code of Fort Worth, Texas. On June 22, 2026, toll records reflect that 682-230-6918 appeared to contact the same Fort Worth, Texas, phone number before and after the purchase of the two firearms from H&H.

17. Based on my review, travelers heading to Hidalgo, Texas, from Oklahoma City, Oklahoma, are likely to pass through Fort Worth, Texas, while driving southbound on Interstate 35.

18. Toll records related to **405-900-3364** reflect that this phone number is used to only contact Mexico-based phone numbers.

19. On September 8, 2026, a United States Magistrate Judge in the Western District of Oklahoma issued a search warrant authorizing the search and seizure of two cellular telephones associated to call numbers **405-900-3364** and 682-230-6918. *See* W.D.O.K. Case Number M-26-443-CMS.

20. On September 10, 2026, ATF agents located **MERAZ** and seized the **SUBJECT DEVICE** associated with call number **405-900-3364** from his person within the Western District of Oklahoma.

21. Based on my training and experience, I know that those engaged in trafficking firearms often use multiple cellphones to separate business and personal dealings and to better evade detection by law enforcement.

22. Based on my training and experience, I know that those engaged in illegally trafficking firearms or dealing firearms without a license often buy

multiple firearms of the same model and caliber, often at the same time or within days of each other, because they intend to traffic and sell those firearms.

23. Based on my training and experience, I know that many of the firearms confiscated by Mexican law enforcement in the course of criminal investigations were originally purchased in the United States.

24. Based on my training and experience, I know that it is common for those receiving firearms in Mexico to communicate with the buyer in the United States via cellphone to select and order specific firearms. Those firearms are often transported to Mexico shortly after being purchased in the United States to efficiently fulfill those orders.

25. Based on my investigation, training, and experience, **MERAZ's** behavior at H&H on June 22, 2026, was consistent with that of an individual communicating with some other person outside the store while selecting specific firearms for purchase. Based on my experience, this type of behavior is common when one individual is illegally purchasing firearms on behalf of another who is not present.

26. Based on my training and experience, I know that those engaged in firearm trafficking and the business of dealing firearms without a license often use cellular devices to plan and coordinate the purchase, transportation, and sale of firearms with other co-conspirators. These cellular devices often

contain contact lists, call logs, messages, photographs, videos, and other notes which relate to their illicit firearm-related business activities.

27. Based on my training and experience, I know that those using cellular devices to engage in criminal activity often keep the devices on their person and in their vehicles to maintain quick and easy access to those devices.

28. Accordingly, based on the aforementioned facts, there is probable cause to believe that the **SUBJECT DEVICE** will contain evidence of federal crimes: namely, firearm trafficking, in violation of 18 U.S.C. § 933, and engaging in the business of dealing firearms without a license, in violation of 18 U.S.C. §§ 922(a)(1)(A) and 923(a), within the Western District of Oklahoma, and elsewhere.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Cellular phones, and specifically iPhones, have the ability to: serve as a wireless telephone, digital camera, portable media player, and GPS navigation device, access the Internet, and use manufacturer installed, as well as downloaded, applications to conduct basic computing and data services. Similarly, things that have been viewed via the Internet are typically stored for some period of time on iPhones. This information can sometimes be recovered with forensic tools.

30. There is probable cause to believe that things that were once stored on the **SUBJECT DEVICE** may still be stored there, at least for the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months, or even years, after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer or cellular device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer or cellular phone's operating system may also keep a record of deleted data in a "swap" or "recovery."

c. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

31. *Forensic evidence*. As further described in **Attachment B**, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **SUBJECT DEVICE** was used, the purpose of their use, who used them, and when. There

is probable cause to believe that this forensic electronic evidence might be on the **SUBJECT DEVICE** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. File systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how that particular device behaves.

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **SUBJECT DEVICE** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

33. *Manner of execution*. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

34. In light of the foregoing, I submit that this Affidavit supports probable cause for a search warrant authorizing the search of the **SUBJECT DEVICE** described in **Attachment A** to seize the items described in **Attachment B**.

Respectfully submitted,

MARC BROWN
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives (ATF)

Sworn and subscribed to before me this 11th day of September, 2026.

CHRIS M. STEPHENS
United States Magistrate Judge
Western District of Oklahoma

**<u>ATTACHMENT A</u>**

The property to be searched is a blue Apple iPhone 16 Pro Max in a blue and black case with assigned call number **405-900-3364** (hereinafter **SUBJECT DEVICE**). The **SUBJECT DEVICE** is currently located at the ATF Oklahoma City Field Office within the Western District of Oklahoma and is shown below.





## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

1. Records on the **SUBJECT DEVICE**, described in **Attachment A**, that relate to violations of 18 U.S.C. §§ 933 and 18 U.S.C. §§ 922(a)(1)(A) and 923(a) during the period of **May 16, 2024, through the present**, such as:

a. information, notes, and location data related to the acquisition, sale, or transportation of firearms;

b. audio recordings, images, or videos related to firearms;

c. information related to the sources of firearms and buyers of firearms, to include: names, addresses, phone numbers, images, videos, audio recordings, and any other identifying information;

d. communications with buyers, sellers, co-conspirators, or others regarding the acquisition, possession, transportation, or distribution of firearms whether such communications be via text messaging, audio messaging, video messaging, email, websites, or communication through an application stored on the **SUBJECT DEVICE**;

e. records and notes detailing the types, quantity, and prices of firearms as well as dates, places, and payment amounts of specific firearm-related transactions;

f. internet usage history, package tracking, electronic or internet mail communications, and electronic payment receipts related to the acquisition, sale, or transportation of firearms;

g. bank records, checks, credit card bills, account information, and other financial records connected to the purchase or sale of firearms:

h. evidence of user attribution showing who used or owned the **SUBJECT DEVICE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, associated accounts, documents, and browsing history:

1. records of Internet Protocol addresses used,

2. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, and

3. photographs, logs, phonebooks, saved usernames and passwords, and documents.

As used above, the terms "records" and "information" include the foregoing items of evidence in whatever form and by whatever means they may have been created or stored on the **SUBJECT DEVICE**.